Frank J. Kronenberg, J.
This is an eve-of-trial application pursuant to what is now article 710 of the GPL (TI. S. Code, tit. 18, § 2518, subd. [10], par. [a]) by defendants above named for an order suppressing certain evidence consisting of approximately 90 reels of tape recordings made of conversations to and from a telephone located on premises occupied by the defendants Steve Allen Tartt and Bonnie Tartt in the City of Buffalo. Each of the defendants except Bonnie Tartt has beeh indicted by an Erie County Grand Jury for violations of the Penal Law dealing with the criminal possession of dangerous drugs and conspiracy; Bonnie Tartt has been charged with conspiracy only. All were arrested July 23, 1970 at which time certain alleged dangerous drugs were also seized during a warrant search of premises occupied by the defendant Michael Teague.
The conversations sought to be suppressed were intercepted' pursuant to an order granted by a Justice of this court on June 3, 1970 upon application of the Erie County District Attorney. That order authorized interception commencing on June 4,1970 of all conversations pertaining to crimes specified in the order and provided “ that such Eavesdropping shall not cease after any one or more of the above described conversations shall have been overheard, but shall cease at the close of the thirtieth calendar date after the above mentioned, to wit: On July 3, 1970, or on the day thereafter which is thirty (30) calendar days after the date of actual installation, whichever last occurs and that such Eavesdropping may be conducted at all hours of the day and night”.
*957 Interception began on June 5 and continued 24 hours a day during the effective period of the order and thereafter pursuant to a 30-day extension granted on or about the 3rd day of July, 1970. Continuous interception occurred through August 2. No efforts were made to limit the interception to conversations relating to criminal activity and as a result a substantial percentage, up to 50%, of the total conversations seized were unrelated to the subject matter of the investigation. Nor did the interception cease upon acquisition of the evidence sought as is shown by the fact that the defendants were arrested on July 23 while the interception continued, as stated above, through August-2. The post-eavesdropping written notice required by CPL 700.50 (subd. 3; U. S. Code, tit. 18, § 2518, subd. [8] par. '[d]) to be given personally to the person named in the warrant, Steve Allen Tartt, and to such other parties to the intercepted conversations as the issuing Justice might determine was not given nor was an order granted against authorizing a postponement in the giving of the required notice.
In March, 1971 motions to suppress the seized conversations and any other tangible evidence acquired as a result thereof were made on behalf of the defendants Tartt, Pickens and Teague. These motions which came on to be heard, by consent, before the Justice who had issued the interception order and the extension thereof were denied by him on August 3, 1971. Upon reargument, the August, 1971 decision was adhered to in a decision dated August 24,1972.
Before passing to the merits of the motion to suppress, two threshold questions require resolution; first, whether consideration of these motions by the writer is foreclosed by the earlier decisions of the issuing Justice and second, whether the instant motions are themselves timely.
The first question is a vital one since: “ The courts of New York are generally committed to the doctrine that one judge of co-ordinate jurisdiction should not vacate, modify, or depart from a ruling or order made by a colleague of equal rank in the same case. The reason for the rule, it has been said, is that any other would render impossible any finalityof the decisional process, reduce the administration of justice to an anarchistic shambles, destroy the morale of the courthouse, create uncertainty, confusion, and insecurity among the court personnel, place the litigant in a revolving door leading from judge to judge as each judge alters the other’s determination, array the contending jurists in professional fratricidal conflict, partisan in nature, and prevent the ultimate determination of the rights *958 of the parties by appropriate appellate review of a final definitive determination.” (32 N. Y. Jur., Judges, § 21; See People v. Canna, 35 A D 2d 1062 [1970] and Matter of Haas, 33 A D 2d 1 [1969].) An examination of the moving papers presented' upon the earlier motions to suppress and the memoranda of decision disclose, however, that the grounds asserted in support of the motions address themselves to the face of the intercept order and to the underlying affidavits presented to establish probable cause except that an additional claim was made to the effect that incriminating statements of defendants not named in the intercept order could not be seized and used as evidence against them without an amendment first having been made to the order itself. That contention was rejected by the issuing Justice in his decision of August 24, 1972 upon the authority of People v. Gnozzo (31 N Y 2d 134 [1972]). While there did appear in the moving affidavit of counsel for the defendant Teague an objection to the provision in the original intercept order dispensing with the giving of the post-eavesdropping notice required by CPL 700.50 (subd. 3), there was. no allegation that notice had not in fact been given and no evidence was taken as to that question and no express resolution of the objection was made in the decisions of August 3, 1971 and August 24, 1972. However, it does seem clear that those two decisions resolved all questions pertaining to the claimed lack of probable cause, all questions directed to defects appearing on the face of the intercept order and to the use of conversations of defendants not named in the intercept order. Although the defendants have directed the court’s attention to decisions of the United States District Court for the Western District of New York holding fatally defective intercept orders containing language identical to that used in the order at hand permitting continuous interception beyond the point that the investigative objectives had been attained (United States v. Todaro, CR1970-142, Sept. 24, 1971; United States v. Joseph, CR1971-2, Feb. 1, 1972), I consider that question insofar as it concerns the face of the order foreclosed to re-examination at this level by the earlier decisions of the issuing Justice. I do hold, however, that objections directed to the manner in which the intercept order was in fact executed are properly subject to review if timely.
On the latter point, which is the second of the threshold questions, it appears that the defendants were first served with notice on October 11, 1972 that certain intercepted telephone conversations would be offered in evidence. This was after *959 the subject indictment had been moved for triál. Only thereafter were defendants permitted to hear the conversations to be offered and to examine the “ log” maintained by the New York State Police who monitored the conversations and supervised operation of the tap 1 I hold therefore that the motions to suppress are timely within the provisions of CPL 710.40 (subd. 2) and XT. S. Code (tit, 18, § 2518, subd. [10], par. [a]) siiice the defendants were necessarily unaware of the fact that the interception was a continuous one which extended even beyond the date of arrest and also because no evidentiary hearing was held prior to trial upon the claimed failure of the People to give the notice required by CPL 700.50 (subd. 3) and XT. S. Code (tit. 18, § 2518, subd. [8], par. [d]).
Turning first to the failure of the People to give notice of the fact that an order authorizing interception had been granted, the date thereof, the period authorized and the fact that oral communications had been intercepted, it must be emphasized that if this omission is fatal it is because it conflicts with a statutory commandment of the Congress of the United States and of the New York State Legislature without reference to the authorizing order which purported to relieve the People of that requirement. How strictly this and other provisions of the Federal and State acts should be read depends largely on one’s reading of the judicial and legislative history leading up to the enactment of section 801 of title III of the Omnibus Crime Control and Safe Streets Act of 1968 (U. S. Code, tit. 18, >§ 2510 el seq.). The New York statutes, articles 700 and 710 of the CPL, formerly titles II-B and III of the Code of Criminal Procedure, are patterned upon the Federal act, as they must be, since the latter is entitled to pre-eminence in authorizing and regulating the interception of wire and oral communications. “ The State statute must meet the minimum standards reflected as a whole in the proposed chapter. The proposed provision envisions that States would be free to adopt more restrictive legislation, or no legislation at all, but not less restrictive legislation.” (.Senate Beport No. 1097, U. S. Code Cong, and Admin. News, 1968, p. 2187.)
The Congress has made it clear that title III was carefully enacted to meet the objections which the United States Supreme Court had enunciated in Berger v. New York (388 U. S. 41) while striking down an earlier New York statute. “Title III was drafted to meet these standards and to conform with Katz v. United States, 88 S. Ct. 507, 389 U. S. 347 (1967).” (Senate *960 Report No. 1097, U. S. Code Cong, and Admin. News, 1968, p. 2153.)
One of the objections set forth in the Berger opinion was that the earlier New York statute required neither notice to those whose communications had been intercepted nor any showing of exigency which might excuse or postpone notice (Berger v. New York, sufra, p. 60). The Congress responded to that ébjection by enacting paragraph (d) of subdivision (8) of section 2518 which requires that notice be given within a reasonable time but not later than 90 days after disapproval of an application for an order or termination of the period authorized. The giving of notice may be postponed upon a showing of good cause as Senate Report No. 1097 notes: “ Yet the intent of the provision is that the principle of postuse notice will be retained. This provision alone should insure the community that the techniques are reasonably employed. Through its operation all authorized interceptions must eventually become known at least to the subject. He can then seek appropriate civil redress for example, under section 2520, discussed below, if he feels that- his privacy has been unlawfully invaded.” (Senate Report No. 1097, U. S. Code Cong, and Admin. News, 1968, p. 2Í94).
The New York State statute has a parallel provision (CPL 700.50, subd. 3). It is, of course, true that one charged with a crime based on evidence procured by wire tapping or bugging is likely to learn that such surreptitious listening occurred but that is not necessarily so in all cases since prosecution might rest on other evidence procured as a result of leads ébtained through the eavesdropping and in cases where no prosecution is instituted at all one would be unlikely ever to learn of the interception. In either case the provisions (U. S. Code, tit. 18, § 2520) for the recovery of civil damages for unauthorized interception, disclosure or use of wire or oral communications would be meaningless.
In a case remarkably similar to the one at hand, the United States Court of Appeals, Third Circuit, recently held that the failure of the government to give the notice dictated by paragraph (d) of subdivision (8) of section 2518 required suppression of the evidence obtained in a wire tap authorized under the New York statute. (United States v. Eastman, 465 F. 2d 1057.) As in this case, the intercept order in Eastman, h.a,d been granted by a New York Supreme Court Justice and contained a provision dispensing with the notice requirement but it seems clear that the result there, suppression of the evidence, would have been the same not solely because the order improperly dig *961 pensed with notice but because notice was not, in fact, given. To put it another way, suppression would have been ordered absent the offending provision since the statute itself requires that a notice or inventory be filed and served.
A contrary position has been taken, at least for the moment, by the United States Court of Appeals, Eighth Circuit, in United States v. Wolk (466 F. 2d 1143) with the warning that “ This is not to say that the notice requirements may be taken lightly in future cases.” However appealing that approach may be, receipt of the challenged evidence with a caveat in fvstnro, the history of such efforts in similar circumstances is not encouraging. Reference is made to the long and patient disinclination of the United States Supreme Court to apply the exclusionary rule to evidence seized in violation of the Fourth Amendment guarantees and offered in State court prosecutions. There were rather clear indications, at least as early as the court’s decision in Wolf v. Colorado (338 U. S. 25) that the continued receipt of illegally seized evidence in State prosecutions would ultimately result in the imposition of the Federal exclusionary rule but these warnings were only partially heeded and the court found it necessary some 12 years later “ to close the only courtroom door remaining open to evidence secured by official lawlessness in flagi'ant abuse of that basic right [to privacy, free from unreasonable State intrusion], reserved to all persons as a specific guarantee against that very same unlawful conduct. We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court.” (Mapp v. Ohio, 367 U. S. 643, 654.)
Perhaps the question is made somewhat easier here since the Congress itself has written an evidentiary sanction into the statute by way of section 2515 of title 18 of the United States Code which provides: ‘ ‘ Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, heading, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter [§§ 2510-2520 of this title].” That the section is exclusionary is made plain by the explanation given in its legislative history: “ Section 2515 of the new chapter imposes an evidentiary sanction to compel compliance with the other prohibitions of the *962 chapter. It provides that intercepted wire or oral communications or evidence derived therefrom may noTT5e~received in evidence in any proceeding before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State or a political subdivision of a State, where the disclosure of that information would be in violation of this chapter. The provision must, of course, be read in light of section 2518 (10) (a) discussed below,which defines the class entitled to make a motion to suppress. It largely reflects existing law. It applies to suppress evidence directly or indirectly obtained in violation of the chapter. There is, however, no intention to change the attenuation rule. Nor generally to press the scope of the suppression role beyond present search and seizure law. But it does apply across the board in both Federal and State proceedings. And it is not limited to criminal proceedings. Such a suppression rule is necessary and proper to protect privacy. The provision thus forms an integral part of the system of limitations designed to protect privacy. Along with the criminal and civil remedies, it should serve to guarantee that the standards of the new chapter will sharply curtail the unlawful interception of wire and oral communications.” (Senate Report No. 1097, U. S. Code Cong, and Admin. News, 1968, pp. 2184,2185. Citations omitted.) That is also the construction given it by the United States Supreme Court in Gelbard v. United States (408 U. S. 41).
The constitutionality of title III and its local satellites may well be influenced by the practices which are permitted under its aegis. One Federal District Court has already expressed the opinion that the act goes well beyond that which is constitutionally permissible under the Fourth Amendment and that its provisions intended to limit continuous, general and secret searches are illusory (United States v. Whittaker, 343 F. Supp. 358). That will surely be so unless such provisions are strictly enforced and the only effective sanction to compel adherence to the statutory mandates is the remedy afforded by the act itself, exclusion of the evidence unlawfully obtained.
I therefore hold that the conversations contained in the 90 reels or recordings which are the subject of this motion were unlawfully intercepted and that the motion to suppress must be granted.
In view of the disposition made above, it is not necessary to examine at length the additional grounds urged in support of the motion to suppress, i.e., the total failure of the police to limit or minimize the interception of communications not *963 subject to seizure and the continuation of the interception beyond the point where the authorized objective had been attained (U. S. Code, tit. 18, § 2518, subd. [5]; CPL 700.30, subd. 7).
As noted earlier, the interception here was continuous from June 5 through August 2, 1970 and necessarily reflects a substantial percentage of nonpertinent conversations. The United States Supreme Court in Berger v. New York (388 U. S. 41, 59, supra) expressed its concern that the New York statute permitted indiscriminate seizure of conversation overheard and stated: “ the statute’s failure to describe with particularity the conversations sought gives the officer a roving commission to ‘ seize ’ any and all conversations. It is true that the statute requires the naming of ‘ the person or persons whose communications, conversations or discussions are to be overheard or recorded * * #’ But this does no more than identify the person whose constitutionally protected area is to be invaded rather than 1 particularly describing ’ the communications, conversations, or discussions to be seized. As with general warrants this leaves too much to the discretion of the officer executing the order. Secondly, authorization of eavesdropping for a two-month period is the equivalent of a series of intrusions, searches, and seizures pursuant to a single showing of probable cause. Prompt execution is also avoided. During such a long and continuous (24 hours a day) period the conversations of any and all persons coming into the area covered by the device will be seized indiscriminately and without regard to their connection with the crime under investigation. ’ ’
Subdivision (5) of section. 2518, referred to above, was designed specifically to guard against the abuse inherent in unrestrained eavesdropping and violations of its provisions have been held to require suppression of all communications seized. (United States v. Scott, 331 F. Supp. 233 [U. S. Dist. Ct., D. C., 1971]People v. Holder, 69 Misc 2d 863 [Sup. Ct., 1972]; State v. Molinaro, N. J. Super. Essex County, 10 Cr. L. 2290, Nov. 24, 1971; contra, United States v. King, 10 Cr. L. 2163 [;S. D. Cal., 1971]; United States v. Lagorga, 340 F. Supp. 1397.)
Since the record developed here does not make it possible to ascertain with reasonable certainty just when the objective of this interception was attained except as one mayiiifer that it occurred prior to the arrests of July 23, decision on that objection is not reached at this time. It is noted, however, that the U. S. Code (tit. 18, § 2518, subd. [5]) provides in part that: “No order *964 entered under this section may authorize or approve the interception of any wire or oral communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty days. ’ ’